IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| VASSER GILBERT, | : | |
| Plaintiff, | : | |
| v. | : | 1:03-CV-108-3(WLS) |
| CHRIS ATKINSON, ET. AL., | : | |
| Defendants. | : | |

**ORDER**

Presently pending before the Court are Defendants' Motion for Summary Judgment (Doc. 37) and Defendants' Motion for Sanctions. (Doc. 49).

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 37) is **GRANTED**[1].

**PROCEDURAL SUMMARY**

The instant case before the Court is a civil rights action brought by Plaintiff under 42 U.S.C. §§ 1983, 1985 and pendent state law claims against Defendants arising from the fatal shooting of his son, Linsey Gilbert ("Mr. Gilbert") by private citizen and former defendant Gene Penland, Jr ("Gene") on November 29, 2001.

Specifically, the instant action alleges violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution; violations of Georgia state law, including, but not limited to wrongful death, assault and battery, tortious negligence, negligent supervision and training, and intentional infliction of emotional distress; and violations of the state constitutional guarantees of equal protection and protection against cruel and unusual punishment.

---

[1] The Court, in the process of considering Defendants' motion for summary judgment (Doc. 37), addressed the issues brought forth in Defendants' motion for sanctions (Doc. 49). Defendants' motion for sanctions is therefore **DENIED as MOOT**.

## JURISDICTION and VENUE

This Court properly exercises jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343 because the matter in controversy is a civil rights action arising under the Constitution and laws of the United States. This Court has supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367(a). Venue is proper in this Court under 28 U.S.C. §1391(b) because the events giving rise to this claim occur within the Albany Division of the Middle District of Georgia. *See also* 28 U.S.C. §90(b), M. D. Ga. R. 3.4.

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). An issue is "genuine" if the quantum and quality of proof necessary to support liability under the claim is raised. Allen v. Tyson Foods, 121 F.3d 642, 646 (11th Cir. 1997). A fact is "material" if it hinges on the substantive law at issue and it might affect the outcome of the nonmoving party's claim. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); *see also* Allen v. Tyson Foods, 121 F.3d at 646. A judgment is appropriate "as a matter of law" when the nonmoving party has failed to meet its burden of persuading the Court on an essential element of the claim. *See* Cleveland v. Policy Management Sys. Corp., 526 U.S. 795, 804 (1999); Celotex Corp. v. Catrett, 477 U.S. at 323.

The movant bears the initial burden of showing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing, or by pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. at 324. To avoid summary judgment, the nonmoving party must do more than summarily deny

the allegations or "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. Celotex Corp. v. Catrett, 477 U.S. at 322-23; Allen v. Tyson Foods, 121 F.3d at 646.  However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## FACTS PRESENTED

**1.    Defendant-Movants' Version of the Facts**

In support of their motion for summary judgment, Defendant-Movants presented the following evidence based on deposition testimony by eyewitnesses Defendant Atkinson, Mr. Penland, Mrs. Penland, and Gene which purports to show there is no genuine dispute of material fact with respect to the instant case.

At or about 4:20 A.M. on November 29, 2001, Linsey Gilbert ("Gilbert") drove his pickup into the backyard of the residence of Tommy and Susan Carroll in northern Mitchell County.  Gilbert was acting strange and erratically.  When told by Mr. Carroll to leave his property, Gilbert crossed the road, then drove up the driveway to the Penland residence.  At this point Gilbert began blowing the horn and driving around in the Penland yard.  Mr. Carroll called the Mitchell County Sheriff's office and reported the vehicle and the strange conduct by the driver.  Mr. Carroll then called the Penlands and advised Peggy Penland ("Mrs. Penland") that the truck was in their yard.  Mrs. Penland woke up her husband, Gene Penland, Sr. ("Mr. Penland") and their son, Gene, and they looked out and watched Gilbert's truck.  Gene got his .22 rifle and leaned it up against the door in case they needed it, and then he and his father went outside to talk to the driver.  At some point, Gilbert got out of his car and asked Mr. Penland if he had any oil for his truck.  Mr. Penland got some motor oil from his garage and gave it to Gilbert.  Gilbert then poured the oil on the ground, at which point he was told to leave and got back into his truck.  After partially driving down the driveway, Gilbert turned onto the Penland's

yard and drove back up near the house.  Mr. Penland again told Gilbert to leave.  Gilbert began to leave but again returned, this time asking to use the telephone.  Mr. Penland refused and told Gilbert to leave.  Gilbert again drove down the driveway, and again returned; this time asking to borrow Gene's truck.  After being told to leave once again, Gilbert drove down the driveway again and returned once more to ask for money.   Each time Gilbert got out of his truck and spoke to the Penland men, he had a steel bar about three feet long in his hand.

At approximately 5:05 A.M., Deputy Chris Atkinson ("Defendant Atkinson") of the Mitchell County Sheriff's Department ("Sheriff's Department" or "Department") was requested to respond to a call regarding a prowler in rural Mitchell County.   While en route to the reported address, he was informed by the dispatcher that the suspected prowler was still at the scene.   As he drove up, Defendant Atkinson observed a male suspect, later identified as Gilbert, holding some type of metal pipe, which Gilbert threw into the bed of the truck as Defendant Atkinson stopped.

At that Point Defendant Atkinson exited from the patrol car and spoke briefly to the Penland men who told him that Gilbert had driven up to their house and was refusing to leave.  Defendant Atkinson then asked Gilbert to walk to his patrol car and began talking to him to figure out what he was doing.  Gilbert made some odd statements and he appeared very nervous and shaky.  Because of this Defendant Atkinson suspected that he was under the influence of drugs or alcohol.   Defendant Atkinson walked back toward the patrol vehicle and tried to call for back up on his uniform radio and asked for Gilbert's driver's license.  As Gilbert gave Defendant Atkinson the license, the officer noticed Gilbert's hands were shaking.  Defendant Atkinson then got into the patrol car and radioed in Gilbert's driver's license number to the Sheriff's Department.  Defendant Atkinson sat in the driver's seat as he received the information while Gilbert stood next to the driver's side toward the rear of the car.

According to depositions taken from Defendant Atkinson, Mr. Penland and Gene, Defendant Atkinson then turned toward the open door and began to get out of the patrol car.  Gilbert screamed "Give it up," turned toward the opened door and physically attacked Defendant Atkinson without provocation.  Then, according to Defendant Atkinson's deposition, Gilbert

4

grabbed Defendant's service pistol from his hip holster.  They began struggling for control of the weapon.  Mr. Penland tried to assist the deputy.  While they struggled, Gene went to get the .22 rifle he left propped by the front door of the house.

Gilbert, Mr. Penland and Defendant Atkinson fell to the ground and Gilbert had the officer's gun in his hand.  Mr. Penland states that he had the barrel of the gun in his hand, but at some point Gilbert got control and then fired the weapon.  Defendant Atkinson felt the blast and thought he had been shot and lost his grip on Gilbert's hand.  Gilbert got up from the ground with the weapon in his hand.

In their depositions, Defendant Atkinson and the Penland men state that Gilbert pointed the pistol at Gene, who was standing by and attempted to shoot him.  He also pointed it at Defendant Atkinson and Mr. Penland.  Gilbert then walked around the patrol car, all the while pointing the gun at the Penland men and Defendant Atkinson and attempting to make it discharge.   As Gilbert walked around, Defendant Atkinson dove into the front seat of the patrol car and began trying to unlock the shotgun above the front seat on a metal partition.   As he did this, Defendant Atkinson noticed Gilbert pointing the pistol directly at his face.  It appeared that Gilbert was pulling the trigger at the time.  Defendant jumped back out of the police car before he had a chance to get a shotgun.

At this point, according to Defendant Atkinson, Gilbert began pointing the pistol at Defendant Atkinson over the top of the patrol car and began banging the pistol on the car alternately pointing the pistol at Defendant and Gene.  With his .22 rifle, Gene fired two warning shots toward Gilbert over the roof of the patrol car.  Gilbert then pointed the pistol at Gene.  Gene then shot at Gilbert.   At this point Defendant Atkinson states that he was fearful that Gilbert would start shooting at him or any nearby member of the Penland family.  He began yelling for Gene to shoot Gilbert.  Gene shot Gilbert.

In his deposition, Gene maintains that even though he had been shot, Gilbert continued to point the pistol at Gene.  Gene continued to shoot at Gilbert.  At this point Gilbert fell to the ground, into view of the patrol car's video camera, which by that time had inadvertently become activated.  Gilbert still had the pistol in his hand when he fell down.  Gene kicked the pistol out

5

of Gilbert's hand as he lay on the ground.

At that point, Defendant Atkinson still thought that he may have been shot. He called the Department for help, communicating his fears and also that the suspect had been shot. Defendant then obtained his shotgun, approached Gilbert and told him not to move. Defendant called for an ambulance twice within two minutes of Gilbert being shot. He was not involved in making any decisions as to when or how the emergency medical units were able to respond and examine Gilbert following this incident. Less than a minute after he fell to the ground, Gilbert stopped moving. Gene had shot Gilbert in the chest area, penetrating his heart; thereby causing his death quickly.

After Gilbert was shot, Defendant Atkinson states that he secured the scene until other deputies arrived a few minutes later; at which time Defendant turned it over to them. Other than Gene kicking the pistol away from Gilbert, there were no alterations made to the scene.

After the shooting, a citizen informed County 911 that there was another suspect and 911 personnel advised officials on the scene that the scene was not secure. About fifteen minutes after Gilbert fell to the ground, two persons approached and briefly examined him. Once the scene was secure, a medic arrived and examined Gilbert. Two minutes later, the medic confirmed Gilbert to be dead.

The Penlands and Defendant Atkinson maintain in their respective depositions that at no time during the encounter with Gilbert did Defendant Atkinson use any racially derogatory or insulting term, and his actions during this encounter had nothing to do with the race of either Gilbert or the Penlands. The manner in which Defendant initially investigated and responded to Gilbert's threat of deadly force was consistent with his law enforcement training. Defendant was acting within the course of his ordinary law enforcement duties as a Deputy.

The Sheriff's Department had written policies and procedures in effect at the time that all deputies were required to apply, equally and impartially, to all persons with whom they came in contact. On the date of the incident at issue, the Department had a written policy in effect which permits use of deadly force when it is reasonably believed that the subject against whom deadly force is used is about to kill or grievously injure another person, or commit a forcible felony.

Sheriff W. E. Bozeman ("Defendant Bozeman") determined that Defendant Atkinson had been properly trained and instructed as to when and how to use deadly force in compliance with federal and state constitutional provisions and law.  Prior to and as of November 29, 2001, Defendant Bozeman had not received a complaint about racially motivated conduct or excessive force by Defendant Atkinson.

Because this incident involved the death of a person during interaction with a deputy sheriff, the Department notified the local Georgia Bureau of Investigation ("GBI") office of the incident and requested it conduct an investigation, which it did.   The cause of death was determined to be a gunshot wound to the heart.  The agent conducting the investigation concluded that the use of deadly force against decedent Gilbert was justified given his conduct and threat of deadly force.  Defendant Bozeman relied on the investigation along with other information he received in determining that Defendant Atkinson complied with Department policies and procedures.

Lab tests revealed that Gilbert had cocaine in his system.  The autopsy also revealed a plastic-wrapped bag of cocaine concealed in his anus.

**2.     Plaintiff-Respondent's Response to Defendant-Movants' Version of the Facts**

Plaintiff-Respondent does not actually dispute many of the facts.   To properly respond to Defendants' version of facts, Plaintiff is required to identify "specific facts showing there is a genuine issue for trial."  <u>Celotex Corp</u>, 477 U.S. at 324.   Plaintiff is also required to do more than "show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586.

Plaintiff offers no specific facts in his response to Defendants' motion that could show there is a genuine issue for trial.  Instead, Plaintiff presents the Court with arguments respecting the weight of and contended conflicts in the evidence Defendants present.   Plaintiff's chief dispute is with Defendants' version of the events immediately surrounding the shooting and killing of Gilbert.  Plaintiff points to the videotape as evidence that directly contradicts Defendants' version of events.  According to Plaintiff, the videotape "clearly" shows Gilbert running away from Gene stating repeatedly "they won't let me go" while Gene is shooting him

multiple times.  This, in and of itself, is not a dispute with Defendants' proffered facts, but rather an argument respecting the weight and credibility of the videotape.   The videotape does not controvert the facts leading up to the shooting as shown by Defendants.  In another example, Plaintiff maintains that the decedent did not have a steel pipe in his hands prior to the shooting. He bases this dispute on the fact that none of the surviving witnesses so claimed in their statements given to police immediately after the shooting that Gilbert got out of his truck until requested to do so by Defendant Atkinson.  This is an argument respecting the credibility of the depositions and not a genuine dispute with the quotes shown in the depositions themselves. There is no admissible evidence that could show that Gilbert ever had the pipe in his hand. While evidence may exist to support Plaintiff's claim, the evidence is not in the record.

## ANALYSIS

**1.     Qualified Immunity**

Plaintiff asserts 42 U.S.C. § 1983 claims against Defendant Atkinson in his individual capacity based on alleged violation of decedent Mr. Gilbert's Fourth, Fifth, Eighth and Fourteenth Amendment rights.  Plaintiff also sues Defendant Bozeman in his individual capacity as supervisor of subordinate law enforcement officers, including Defendant Atkinson, based on allegedly deficient policies, procedures, or training.

In Graham v. Connor, 490 U.S. 386 (1989), the Supreme Court stated that when addressing a § 1983 claim, the court must identify the specific constitutional right allegedly infringed and then judge the claim by reference to the specific constitutional standard which governs that right.  Recently, the Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001), clarified the mode of analysis the court must use when addressing a qualified immunity issue.  In Saucier, the Court held that the merits of the Fourth Amendment excessive force claim and the concern for the "objective reasonableness" of an officer for qualified immunity purposes were two distinct questions even after Graham.  *Id*. at 204.

### A.     Merits of Constitutional Claims

First, the Court stated that a court required to rule upon the qualified immunity issue must first consider whether the facts as alleged, taken in a light most favorable to the party asserting

the injury, show the individual defendant's conduct violated a constitutional right. *Id*. at 201, *citing*, Siegert v. Gilley, 500 U.S. 226, 232 (1991). If no constitutional right would have been violated were the allegations established as true, there is no necessity for further inquiries concerning qualified immunity. *Id*. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was "clearly established" because qualified immunity inquiries have a further dimension. This inquiry, the Court explained must be taken in light of the specific context of the case, not as a broad general proposition. *Id*.

The right the official must have allegedly violated must be "clearly established" in a more particularized sense. The Supreme Court reasoned in Saucier that it is sometimes difficult for a defendant to determine how the relevant legal doctrine, excessive force in the Saucier case, will apply to the factual situation the defendant confronts. *Id*. at 204. The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id*., *see*, Wilson v. Layne, 526 U.S. 603, 615 (1999). Therefore, the Supreme Court has stated that if a material issue of fact remains on the claim then summary judgment can not be granted in favor of the plaintiff. However, the defendant is entitled to summary judgment as a matter of law if the law would not have put the defendant on notice that his conduct would be clearly unlawful. Saucier at 203.

In the Eleventh Circuit, for a right to be "clearly established" for purposes of qualified immunity, "the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." Jackson v. Sauls, 206 F.3d 1156, 1164 (11th Cir. 2000), *quoting*, Lassiter v. Alabama A & M Univ. Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994). Specifically, in the Eleventh Circuit qualified immunity almost always protects the defendant unless case law, in factual terms has staked out a bright line. Jackson, 206 F.3d at 1165.

The first inquiry is whether the facts as alleged, taken in a light most favorable to the party asserting the injury, show Defendants' alleged conduct violated a constitutional right.

9

### B. Fourth Amendment Claim

Defendant Atkinson argues that he cannot be held liable under the Fourth Amendment for decedent's death as a matter of law because he did not use force; and alternatively deadly force was reasonable and justified. The Eleventh Circuit holds "use of deadly force during an arrest [to be] constitutional if it strikes a balance between the competing interests of the individual and society that is objectively reasonable under the totality of the circumstances." O'Neal v. Dekalb County, 850 F.2d 653, 657-658 (11th Cir. 1998). It is "clearly established law that use of deadly force does strike such a balance when necessary as an act of self-defense or when necessary to stop a dangerous fleeing felon." *Id.*

Defendants contend that the issue here is similar to that in Harrell v. Decatur Co. where the Eleventh Circuit applied the O'Neal standard in holding a deputy sheriff to be immune from suit when the totality of the circumstances suggested his use of deadly force was reasonable as a means of seizing a dangerous fleeing felon. *See* 22 F.3d 1570, 1579 (11th Cir. 1994) (Dubina J. dissenting), *dissent adopted on rehearing*, 41 F.3d 1494 (11th Cir. 1995). In Harrell, the Court dismissed as immaterial questions of fact as to whether the decedent was in fact reaching for a weapon when it was settled that the decedent was reaching downward under his car seat at the time the deputy shot him. *Id*. at 1579-1580. In those circumstances, the Court held that the officer had probable cause to believe the decedent may have had a weapon such that the use of deadly force was reasonable.

In the instant case, the facts presented, taken in a light most favorable to Plaintiff, support a finding that it was reasonable for Defendant Atkinson to use deadly force to protect himself and the Penlands. Given the totality of the circumstances before Defendant Atkinson, his request that Gene shoot the decedent, who at that moment in time had control of Defendant's gun, was justified. Defendant Atkinson has sufficiently met his burden of proving that he was acting within the scope of his discretionary authority when he told Gene to shoot the decedent. *Id*. at 1578, *citing* Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir. 1988).

The Court therefore **GRANTS** Defendants' motion for summary judgment (Doc. 37) with respect to the Fourth Amendment claim.

### C. Fifth Amendment Claim

Defendant argues that he cannot be liable under the Fifth Amendment because "it is axiomatic that the Fifth Amendment due process clause applies only to the federal government, while the Fourteenth Amendment due process clause applies to the states." *See* Mindler v. Clayton County, Ga., 831 F. Supp. 856, 860 (N.D.Ga. 1993). Plaintiff brings forth no evidence that the decedent had any dealings whatsoever with the federal government.

The Court, therefore, **GRANTS** Defendants' motion for summary judgment (Doc. 37) with respect to the Fifth Amendment claim.

### D. Eighth Amendment Claim

Defendant also moves for summary judgment on Plaintiff's Eighth Amendment claim. The Eleventh Circuit held in Hamm v. DeKalb County, 774 F.2d 1567, 1572 (11th Cir. 1985), that:

> The eighth amendment, however, applies only to confinement that occurs subsequent to and as a consequence of a person's lawful conviction of a crime. 'The State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.' Conditions of confinement imposed prior to conviction are limited instead by the due process clause of the fourteenth amendment. [citations omitted].

As Mr. Gilbert was neither a convict nor charged with a crime in relation to this incident, the Eighth Amendment does not apply.

The Court, therefore, **GRANTS** Defendants' motion for summary judgment (Doc. 37) with respect to the Eighth Amendment claim.

### E. Fourteenth Amendment Claim

Defendants move for summary judgment on Plaintiff's Fourteenth Amendment claim as a matter of law because he acted promptly to obtain medical care for the decedent and medical assistance was futile. Under a widely held standard announced by the Eleventh Circuit in Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176 (11th Cir. 1994), Plaintiff has the burden of placing before the Court medical evidence verifying that the delay in providing medical assistance caused a detrimental effect on the decedent's chances of survivability. The

11

decedent was shot multiple times. Moreover, he was shot in the heart. Plaintiff offers no medical evidence in his response that could establish any detrimental effect the delay in arrival of medical assistance teams caused the decedent.

The Court therefore **GRANTS** Defendants' motion for summary judgment (Doc. 37) with respect to Plaintiff's Fourteenth Amendment claim.

### F. Defendant Bozeman

"Supervisors can be held liable under § 1983 when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiffs, and his conduct was causally related to the constitutional violation committed by his subordinate." Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003) (citations omitted). Because Defendant Atkinson did not commit a constitutional violation, Defendant Bozeman cannot be held liable under § 1983 as a matter of law. *See* Analysis, Part 1B-E, *supra*.

The Court therefore **GRANTS** Defendants' motion for summary judgment (Doc. 37) with respect to qualified immunity for Defendant Bozeman from Plaintiff's § 1983 claims.

## 2. § 1985 Conspiracy Claim

Plaintiff asserts a claim that Defendants are liable under 42 U.S.C. § 1985 for conspiring to violate Mr. Gilbert's civil rights. To set forth a conspiracy claim, § 1985 requires Plaintiff to allege:

> that two or more persons...conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.

Plaintiff makes no such showing in his response to Defendant's motion for summary judgment or his brief attached in support of said response.

The Court, therefore **GRANTS** Defendant's motion for summary judgment (Doc. 37) with respect to the § 1985 conspiracy claim.

## 3. State Law Claims

Plaintiff also raises state claims against the Defendant Mitchell County and Defendants

Atkinson and Bozeman. Defendants argue that they are entitled to summary judgment on the basis of sovereign and official immunity.

The County, and the law enforcement Defendants in their official capacity, argue they are entitled to summary judgment on Plaintiffs' state law claims because of the application of the doctrine of sovereign immunity.  Georgia law provides that counties and state officials are immune from suit for torts, except as waived by the legislature. Woodard v. Laurens County, 265 Ga. 404, 405  (1995).  As there has been no proof that Defendants have  waived their sovereign immunity, Plaintiffs state law claims against these Defendants must fail.  Therefore, the Defendants  motions for summary judgment (Doc. 37) on Plaintiffs' state law claims on the grounds of official immunity are **GRANTED.**

State officers and municipal employees are entitled to official immunity from claims by citizens except when they perform ministerial duties negligently or when they act with actual malice in the performance of their official duties.  Gilbert v. Richardson, 264 Ga. 744 (1994). Plaintiff alleges Defendants acted with actual malice in the performance of their official duties. Absent evidence of malice, willfulness, or corruption, a public officer is afforded immunity from liability to those who may be injured by the exercise of his discretion in the performance of his official duties.  White v. Traino, 244 Ga. App. 208, 211 (2000).  Actual malice means a deliberate intention to do wrong.  *Id*.   Plaintiff provides no evidence, that if believed, shows that Defendant Atkinson acted with actual malice or the intent to harm Mr. Gilbert without justification.  Plaintiff provides no evidence that could support a finding that Defendant Bozeman similarly acted with malice or the intent to harm the decedent.  Therefore, the individual Defendants' motions for summary judgment (Doc. 37) on Plaintiff's state law claims, in their individual capacities are **GRANTED**.

## **CONCLUSION**

Having presented no evidence which would support a finding that there are genuine issues for trial, Plaintiff has failed to meet his burden. The Court, therefore, **GRANTS** Defendant's motion for summary judgment (Doc. 37) as there is no genuine issue of material

fact. Defendant is entitled to judgment as a matter of law pursuant to Fed. R. Civ. P. 56(c).

**SO ORDERED**, this  30th  day of September, 2005.

                                        **/s/W. Louis Sands**
                                        **W. LOUIS SANDS, CHIEF JUDGE**
                                        **UNITED STATES DISTRICT COURT**